## DECLARATION

This Declaration is submitted in support of a complaint for forfeiture *in rem* of One Lot of U.S. Currency in the amount of $106,800.

1.  I, ANGELO S. MELETIS, a Special Agent, with the Drug Enforcement Administration (DEA), submit this Declaration to establish sufficient facts to support a reasonable belief that the $106,800 in United States Currency (the Defendant Property), constitutes one or more of the following (i) money furnished and intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (ii) proceeds traceable to such an exchange; and (iii) money used and intended to be used to facilitate a violation of the Controlled Substances Act in violation of 21 U.S.C. § 841, and thus is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

2.  I am a Special Agent with the Drug Enforcement Administration ("DEA"). I have been employed by the DEA as a Special Agent since September 1990. As a Special Agent of the DEA, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws as embodied in Title 21 of the United States Code. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses. From September 2018 to the present, I have been assigned to the DEA's Providence District Office (PDO), in Warwick, Rhode Island. The Providence District Office is comprised of DEA agents as well as task force officers from local area police departments. I have received specialized training regarding narcotics investigations while attending the DEA Academy in Quantico, Virginia. I also receive periodic in-service training relative to conducting narcotics investigations. As a DEA Special Agent, I have participated in numerous narcotics-

related investigations resulting in State and Federal convictions of numerous individuals for narcotics trafficking offenses. I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement. I am also familiar with the terminology and slang commonly employed by drug traffickers. Acting in an undercover capacity, I have negotiated for the purchase of controlled substances from targets of federal narcotics investigations. I have also coordinated controlled purchases of controlled substances utilizing confidential sources and undercover law enforcement agents and officers. I have prepared numerous affidavits is support of applications for search warrants, arrest warrants, and pen register authorizations. I have conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances. I have analyzed records documenting the illegal purchase of and sale of controlled substances. I have testified in both United States District Court and in federal grand jury investigations, and my testimony has contributed to the indictment and conviction of numerous individuals. I have participated in multiple Title III wiretap investigations and have served as co-case agent in these wiretap investigations. Based on my training and experience, I am aware that drug traffickers commonly utilize cellular telephones in furtherance of their drug trafficking activities and frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. The information set forth in this affidavit is based on my own investigation, information provided by others involved in this investigation, my training and experience, and the training and experience of others involved in this investigation. I do not set forth all information known to law enforcement about this matter,

as the purpose of this affidavit is to set forth only cause sufficient to support initiation of a civil forfeiture action.

    a. On July 30, 2020, at approximately 12:15 p.m., Warwick Police Officer Richard Odell was working a speed detail in a marked Warwick Police cruiser on the Post Road Extension when Odell clocked a vehicle traveling southbound at 56 mph in a posted 35 mph zone. Officer Odell stopped the speeding vehicle, a grey 2020 SUV Mitsubishi Outlander, bearing Florida license plates BPFE71. The operator was identified by his Florida driver's license as Joshua Fontanez Rodriguez ("Joshua"), with an address in Homestead, Florida. Joshua's front seat passenger was also identified by a Florida driver's license as Jodiel Gutierrez Rodriguez ("Jodiel"), Joshua's brother.

    b. Officer Odell advised Joshua that he had been stopped for going in excess of the speed limit. Odell noticed that Joshua was nervously sorting through his bag putting his hand in and out even after he had his driver's license in his hand. Joshua spoke broken English, but the two men were able to communicate.[1] Joshua produced a rental agreement showing that the Outlander had been rented on July 12, 2020, to a third party by the name of John Santana. Joshua stated that John Santana, the name on the rental agreement, was a friend who had helped Joshua out because Joshua did not have a credit card.

---

[1] While Officer Odell had trouble discerning some things that Joshua said, Officer Odell felt that Joshua spoke English well enough that the two men could communicate effectively.

    c. Joshua stated that he was driving to his home and driving to Miami. The address on Joshua's driver's license was listed as Homestead, Florida. Joshua stated that he was in Rhode Island to visit his mother who was sick. He stated that his mother lived with his aunt in Cranston. Joshua also stated that he arrived in Rhode Island on Tuesday and was leaving to go back to Florida when he was stopped.[2] When asked why he would drive from Florida to Rhode Island to visit for such a short amount of time, Joshua said that he had to get home to work. Officer Odell could see a small backpack behind the driver's seat along with a large quantity of what appeared to be recently purchased clothes in store bags, and bags from high end designers such as Coach and Lacoste. Both Joshua and Jodiel stated that they had purchased the merchandise at the Providence Place Mall. Officer Odell did not see any luggage of any kind other than the aforementioned small backpack.

    d. Joshua kept making furtive movements reaching between his legs so Officer Odell ordered Joshua out of the vehicle. Joshua appeared very hesitant and nervous, asking, "Why?" When asked again to exit the vehicle, Joshua again asked, "Why?' in a nervous tone. When Joshua exited the vehicle, Officer Odell noticed a flip cell phone between his legs. Joshua was observed to have another cell phone as well.

    e. Officer Odell requested K9 handler Steere to come to the scene. While waiting, Officer Odell again asked Joshua where he was going and this time Joshua stated

---

[2] The date Rodriguez was stopped, July 30, 2020, was a Thursday.

    that he was going to stop at Orlando for vacation. When asked what he did for work, Joshua pointed to an 18-wheel tractor trailer car-carrier and said that he drove one of those. Officer Odell noted that Joshua's Florida driver's license was a class E[3]; which is a noncommercial driver's license that does not permit operation of 18-wheel tractor trailers.

f. While outside the vehicle, Joshua told Officer Odell that he and his brother Jodiel, had stayed at a Motel 6 because their aunt's house was too crowded. K9 handler Steere arrived and at that time Officer Odell told Jodiel to exit the vehicle. Joshua told Officer Steere that he had stayed at the Radisson.

g. Officer Steere asked Joshua if there was anything in the vehicle that could harm the dog, K9 Garry. The two men advised that there was not. Officer Steere then asked if there were any narcotics in the vehicle, asking about each of the following drugs separately, to include, heroin, fentanyl, methamphetamine and cocaine. Each time Joshua looked directly at the Officers and responded confidently, "No." Officer Steere then asked Joshua if there were any large amounts of US currency in the vehicle. The driver, Joshua, looked away from the

---

3 CLASS E: Any non-commercial motor vehicles with Gross Vehicle Weight Rating (GVWR) less than 26,001 pounds, including passenger cars, 15 passenger vans including the driver, trucks or recreational vehicles and two or three-wheel motor vehicles 50 cc or less, such as mopeds or small scooters. Florida Highway Safety and Motor Vehicles website.
https://www.flhsmv.gov/driver-licenses-id-cards/general-information/license-classes-endorsements-designations/#:~:text=CLASS%20E%3A%20Any%20non%2Dcommercial,as%20mopeds%20or%20small%20scooters.

officers toward his vehicle and said, "no" in a low tone of voice. It was the officers' opinion that Joshua was not being truthful.

h. K9 Garry was then removed from the police vehicle by K9 handler Steere[4] and started at the back of the SUV Outlander where K9 Garry was given the command to search. K9 Garry made his way along the rear hatch and along the passenger side of the vehicle. As K9 Garry passed by the open passenger side door he immediately reversed directions and went inside the vehicle through the passenger's side door (that Jodiel had left open). K9 Garry began to search the front dashboard and down by the driver's side floorboard area where K9 Garry showed a positive indication on what was later discovered to be a black satchel, the same bag that Officer Odell had seen Joshua nervously fiddling with earlier. The bag contained a large sum of cash, approximately $1,800, that Joshua said was his tax money.

i. Officer Steere removed K9 Garry from the vehicle after observing the positive indication, to lessen the risk of K9 Garry coming into contact with a controlled substance that could harm or kill the dog. K9 Garry continued his exterior search of the vehicle and indicated interest at the driver's side door seam at which time

---

4 Officer Steere and Canine Garry are a certified narcotics detection team through the RI Police Work Dog Association and the RI Department of Corrections. K9 Garry has successfully passed certifications in the area of narcotics detection consistent with national standards of the North American Police Work Dog Association. K9 Garry is trained to detect the odors of heroin, cocaine, methamphetamine and fentanyl. K9 Garry had been certified for almost two years at the time of the search. K9 Garry has been deemed reliable in affidavits used to obtain federal search warrants and his use has resulted in the seizure of large amount of both illegal narcotics and U.S. currency.

    he showed an additional positive indication from the exterior of the vehicle. A hand search of the vehicle resulted in locating the backpack located behind the driver's seat that also contained a large quantity of currency in 11 separate bundles. The 11 separate bundles each contained 5 smaller bundles of currency, each wrapped in rubber bands. The backpack also contained a toothbrush and toothpaste.

j. When asked how much money was in the backpack, Joshua said he would talk to his lawyer. When asked where he obtained the money, he said that his family has businesses. He also said that he drove up from Florida to Rhode Island with the money. Joshua declined to speak with the Officers further. Joshua was issued a speeding ticket, given a receipt for the U.S. currency found in the vehicle,[5] and both he and his brother Jodiel were released at the scene.

k. Prior to Joshua leaving the scene, your declarant was contacted to respond to the scene. Upon arrival, I spoke with Joshua. As a DEA special agent, I worked in the country of Colombia for 5 years and speak Spanish. I began speaking to Joshua in Spanish and we exchanged pleasantries. He then indicated that he could speak English and we continued our conversation in English. I had no difficulty understanding or communicating with him. Joshua explained that the money was from an auto parts business that he owned in Homestead, Florida.

---

5  The money was not counted until after it was brought to the local DEA office. The amount of currency, $106,800, was noted when Joshua was sent notice of forfeiture proceedings.

l.  The currency was transported to the local DEA office, where the currency was placed into one filing cabinet in a row of filing cabinets in a sterile office. Officer Steere was not present when the currency was put into the filing cabinet nor was he told which filing cabinet the currency was in. Officer Steere and K9 Garry were then let into the room where K9 Garry searched off lead. K9 Garry searched several rows of large upright filing cabinets before responding back to the one that contained the U.S. currency. K9 Garry positively indicated to the cabinet containing the currency.

m.  On October 13, 2020, Doris Marth Peralta Mendez signed an affidavit under penalties of perjury, stating that she has owned a business called Hip Hop Communications on Broad Street, Providence, Rhode Island for 16 years. She further averred that her address is in Homestead, Florida and that in late July of 2020, she was in Florida, sick with the Corona virus. She became worried when she learned of an accident that took place in front of her store when a car came through the front window because she had over $105,000 in savings inside the business, inside a "security case." She further averred that the money was her life savings and that she was planning to buy a house. She sent her friend Joshua Fontanez-Rodriguez to retrieve the money. She stated that he drove to Rhode Island, found the money inside her business, and planned to drive back to Florida.

n.  On November 9, 2020, DEA Task Force Officer Carbonell and U.S. Postal Inspection Service Task Force Officer Leon approached Joshua Fontanez Rodriguez, identified as the same individual operating the vehicle on July 30,

2020, from which the $106,800 was seized. Joshua was in a post Office in Hato Rey, Puerto Rico and had just picked up a parcel. When asked about the parcel Joshua immediately placed it on the ground. When asked why he put it on the ground, Joshua responded because "it's not mine." Although law enforcement did not disclose the information to Joshua, law enforcement had been surveilling the package because they knew it contained two bricks[6] of cocaine. Joshua agreed to answer more questions. Joshua stated that he lived in Homestead, Florida. He said he was in Puerto Rico to have a good time. Joshua was shown a picture of himself delivering the same package to a US Postal Store located in San Juan, Puerto Rico earlier. Joshua admitted that the man in the picture was himself. The package was addressed to Joshua's address in Homestead, Florida but in the name of Kevin Lopez Rivera. Through my training and experience as a DEA agent, I know that drug traffickers often use their own or associates' addresses to mail contraband and put a false name on the package in an attempt to deny ownership if law enforcement intercepts the contraband contained in the package. The package containing the cocaine had already been intercepted by law enforcement after Joshua first delivered it to the post office addressed to his Homestead, Florida address. An individual, who identified himself as Kevin Lopez, the addressee on the package, had inquired about the package in a Florida Post Office and was told by the postal inspector that it had been returned to Puerto Rico. The postal

---

6 A brick usually weighs around 1 kilogram. Law enforcement estimated the gross weight of the cocaine and packaging was 1.93 kilograms.

inspector also informed Lopez that whoever was going to retrieve the parcel at the Puerto Rico post office would need to have their own identification as well as a copy of the addressee's identification containing their name and address. The online tracking service provided tracking information indicating that the package had been "lost." After the system indicated that the package had been located and was "ready for pickup," Joshua came to the post office and retrieved it. Joshua denied knowing that drugs were in the package but admitted that he was paid $200 to $300 to mail the package and then paid another $500 to retrieve the same package. He also admitted that he knew the people who paid him were drug dealers and that he had done this more than once. He claimed that he had mailed it at his brother-in-law's instructions; that he mailed it to a Kevin Lopez. Joshua produced a picture of a driver's license in the name of Kevin Lopez, with the same address as Joshua's in Homestead, Florida. Law enforcement determined that the "Kevin Lopez" driver's license was fraudulent.

3. Based on the foregoing, there is probable cause to believe or otherwise legally sufficient cause to believe that the $106,800 in United States Currency described above, is the proceeds of the distribution of controlled substances and/or was intended to be furnished in exchange for controlled substances, and that therefore this currency is subject to seizure and forfeiture pursuant to 21 U.S.C. § 881(a)(6) (civil forfeiture of drug trafficking proceeds) and § 881(a) (civil forfeiture of monies involved in or used to facilitate drug trafficking).

Pursuant to 28 U.S.C. § 1746, I, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Angelo Meletis
Special Agent

Drug Enforcement Administration

DATE: January 15, 2021